IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| RANDY WINCHESTER and<br>EMILY WINCHESTER<br><br>    Plaintiffs,<br><br>v.<br><br>BIGFOOT ON THE STRIP, LLC;<br>DARRELL HENLEY;<br>EMMA HAMILTON;<br>NEALE & NEWMAN, L.L.P.;<br>and BRYAN FISHER;<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 21-3103 |

## COMPLAINT

COME NOW, Plaintiffs, Randy Winchester and Emily Winchester, by and through their undersigned attorneys, and for their cause of action against Defendants Bigfoot on the Strip, LLC, Darrell Henley, Emma Hamilton, Neale & Newman, L.L.P., and Bryan Fisher, hereby state and aver as follows:

## PARTIES

1. Plaintiff Randy Winchester is a resident of Johnson County, Kansas.

2. Plaintiff Emily Winchester is a resident of Douglas County, Kansas.

3. Defendant Bigfoot on the Strip, L.L.C. (hereinafter "Bigfoot") is a Missouri limited liability company operating in Taney County, Missouri, and may be served with process through its registered agent: Richard L. Schnake, 1949 E. Sunshine Street, Suite 1-130, Springfield, MO 65804.

4. Defendant Bigfoot is owned by three members: Darrell Henley, Emma Hamilton, and Matt Cook.

5. Defendant Darrell Henley ("Henley") is a resident of Nixa, Missouri.

6. Defendant Emma Hamilton ("Hamilton") is a resident of Branson, Missouri.

7. Matt Cook is a resident of Rogersville, Missouri.

8. Defendant Neale & Newman, L.L.P. (hereinafter the "Law Firm"), is a Missouri limited liability partnership, with its principal place of business in Springfield, Greene County, Missouri, and may be served with process through its registered agent: Paul G. White, Esq., 1949 East Sunshine Street, Suite 1-130, Springfield, Greene County, Missouri.

9. Defendant Bryan Fisher (hereinafter "Fisher") is a resident of Springfield, Greene County, Missouri.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

11. This Court has personal jurisdiction over the Defendants named herein, in that each reside and/or do business in the state of Missouri.

## FACTS COMMON TO ALL COUNTS

### *Bigfoot's Tour to Bigfoot Farms*

12. Bigfoot operates an entertainment venue on the strip in Branson, Missouri, where patrons pay fees to play miniature golf, play arcade games and participate in other interactive experiences.

13. In 2017, Bigfoot began offering a tour wherein guests paid a fee to take "safari trucks" on a scenic drive in the area, including a stop at "Bigfoot Farms", also owned by Darrell Henley.

14. During the time guests were touring Bigfoot Farms in the trucks, they had the opportunity to see and interact with Scottish Highland cattle maintained on the land.

15. After interacting with the cattle, guests were driven around the Bigfoot Farms property and regaled with Bigfoot legends and stories before they were returned to the Bigfoot venue on the Branson strip.

16. Bigfoot planned to enhance the safari tour with additional elements, and to ultimately "roll out" the Bigfoot Discovery Expedition Tour.

17.     While Bigfoot did not unveil the "Bigfoot Discovery Expedition Tour" until the summer of 2018, promotional material published by Bigfoot in 2017 referred to the "Bigfoot Discovery Expedition Tour", did not disclose that the tour offered in 2017 was something other than the Bigfoot Discovery Expedition Tour, and did not disclose that the Bigfoot Discovery Expedition Tour was something coming soon or otherwise unavailable in 2017.

18.     When the "Bigfoot Discovery Expedition Tour" did launch in 2018, the tour traveled the same route as the 2017 tour, and cost the same price.

*Heartland Highland Cattle Association and the Annual Meeting*

19.     In 2017 and 2018, Bigfoot owner, Darrell Henley, as well as defendant Randy Winchester, were members of the Heartland Highland Cattle Association (hereinafter the "HHCA").

20.     The HHCA is an educational association that promotes and educates the public about Highland cattle, and is generally compromised of farmers that raise Highland cattle.

21.     In March 2018, the HHCA hosted its annual meeting in Branson, Missouri.

22.     While planning for the March 2018 meeting, Gloria Asmussen of the HHCA contacted Henley about hosting members of the HHCA for the "safari" that Bigfoot was offering at the time, and to find out the price Bigfoot would charge per person if the group arranged to take the tour at the time of the annual meeting.

23.     Henley responded, and stated that if they went as a group, he would agree to charge $10 per person provided that everyone agreed to tip the drivers in addition to the per person ticket price.

24.     Asmussen agreed to the price proposed, and inquired further about the appropriate tip amount because she planned to have the HHCA cover the driver tips.

25.     Henley responded, with copy to Emma Hamilton, confirming the agreement to offer the tour for $10/person and further noting that a tip of $2/person would be acceptable.

26.  Thereafter, Asmussen communicated with Hamilton about the details, including confirmation that she could refer to the tour as the "Bigfoot Safari Discovery Tour" in the invitation to members, which Hamilton approved.

27.  Hamilton further directed Asmussen that payment for the $10/ticket price should be directed to Bigfoot on the Strip, but that driver's should be paid the tip directly.

28.  Plaintiff, Randy Winchester, paid the HHCA $40.00 for four safari tour tickets, so that he could participate with his wife, his daughter Emily and Emily's fiancé.

29.  Plaintiffs each attended the HHCA annual meeting and took the safari tour.

30.  Neither Hamilton nor Henley participated in the safari tour, and neither had personal knowledge as to what happened on the tour.

31.  Hamilton informed HHCA members in person at the HHCA meeting, acting on behalf of Bigfoot, that the tour they would take and the tour Bigfoot was operating at the time was different in that it was offered at a different time of day, three trucks instead of the typical single truck carried participants, and the tour would spend more time with the cattle.

*The Trip Advisor Review and Henley's Calls and Threats*

32.  After returning to Kansas, Randy Winchester posted the following review to the Bigfoot on the Strip page on TripAdvisor.com:

> We did the Bigfoot Safari tour as part of a large group. The $10 price tag is about right for what we got. Basically, a tour through some pretty rugged country on some pretty narrow roads. They promote the fact they have the largest herd of Highland cows in the Midwest. You spend about 5-10 minutes feeding them range cubes at the beginning of the tour, and see maybe 10 of the cows. Then it is off into the hills you go with a guide telling some pretty fanciful tales along the way. All in all a decent experience but had we paid more than $10 I would have been disappointed.

33.  On a scale of one to five, Randy Winchester gave the tour experience three stars and identified himself as "randy w".

34.  After seeing the review, Henley reviewed HHCA member information and concluded that member Randy Winchester left the review.

35. Thereafter, Henley called the number associated with Randy Winchester's HHCA membership listing, and reached Plaintiff Emily Winchester because the number associated with Randy Winchester's HHCA's membership listing is the personal cell phone of his daughter, Plaintiff Emily Winchester.

36. Emily Winchester lives at the farm where Randy Winchester raises his Highland cattle, and she uses her personal cell phone to address inquires about the farm her father operates.

37. Emily Winchester refused to provide Henley with a phone number for Randy Winchester, but offered to convey Henley's request to speak with Randy Winchester to her father.

38. Shortly thereafter, Henley messaged Randy Winchester on Linked In, asking Randy to revise what he referred to as the "very harmful Trip Advisor review where you reference $10 price."

39. Subsequently, Henley called the number where he had reached Emily Winchester on two occasions; and called Randy Winchester's home phone number at 8:23 p.m. on a Saturday night in an effort to speak with him.

40. Henley then emailed Emily Winchester, addressing the email to Randy as well, asserting Randy's review was libelous because Bigfoot did not offer $10 tickets and threatening to file a lawsuit against both Randy and Emily Winchester.

41. Thereafter, Randy Winchester amended his three-star review on TripAdvisor to a one star review, relating the efforts made by Henley to contact him, as well as Henley's threats to sue Randy and his daughter.

42. Bigfoot, through its attorney, Bryan Fisher of Neale and Newman, L.L.P., subsequently submitted a written demand to Randy Winchester, threatening him with a lawsuit if he did not remove his review on TripAdvisor.

*The Underling Litigation*

43. On April 13, 2018, Henley made good on his threats, and Bigfoot filed suit against both Randy and Emily Winchester, and Randy's sole propriotorship, Dancing Cow Farms, asserting – falsely

– that Emily Winchester told Henley during one of the calls that she had written the review. That suit is referred to herein as the "underlying litigation" or the "underlying action", and refers to the case styled Bigfoot on the Strip v. Randy Winchester and Emily Winchester, Case No. 18-3155-CV-S-BP, filed in the United States District Court for the Western District of Missouri.

44. While neither Emma Hamilton nor Darrell Henley participated in the tours they claimed Randy Winchester incorrectly described in his review, neither Henley, Hamilton or their lawyers made an investigation into whether the statements were true prior to filing suit.

45. Specifically, no one attempted to or did interview the Bigfoot employees who drove the safari trucks the day of the tour and were the only Bigfoot personnel with personal knowledge as to what transpired the day of the tour.

46. Prior to initiating the lawsuit, Defendants failed to investigate the legal status of Dancing Cow Farms, or its priority to be sued under Missouri law.

47. Defendant Bryan Fisher and his firm, Defendant Neale and Newman, filed the lawsuit on Bigfoot's behalf, and prosecuted that suit through the date the Court ultimately granted summary judgment in favor of Randy and Emily Winchester.

48. To fund the defense of the maliciously filed lawsuit, Randy Winchester started a campaign on FundedJustice.com where he described the tour and the events that occurred thereafter, including the lawsuit.

49. While Randy Winchester removed the FundedJustice campaign only a short time later, Defendants filed amended claims against Mr. Winchester asserting that Randy Winchester's post there was also defamatory.

50. During an interview with the Springfield News-Leader, Emily Winchester disclosed that she did not write the TripAdvisor review, and that she did not know about the TripAdvisor review until Henley contacted her following its publication.

51. When the Defendants amended the claim, they also asserted that Emily Winchester's statement to the Springfield News-Leader were also false and defamatory.

52. During the discovery phase of the underlying action, the Defendants herein failed to produce any evidence supporting their claims.

53. Rather, the investigation conducted during discovery confirmed not only that the purportedly "false" statements were true, but that Bigfoot, Henley, Hamilton, and Fisher knew that Randy Winchester's statements were true.

54. Specifically, early in discovery during the underlying action, the HHCA responded to a subpoena, producing email correspondence between Hamilton and Henley and the HHCA that confirmed the following:

   a. That Bigfoot had, indeed, charged $10.00/person for the tour that the Winchesters took;

   b. That while Bigfoot had requested that drivers be tipped, that Bigfoot also specifically requested that the tip should be paid directly to the drivers and not to Bigfoot on the Strip;

   c. That the HHCA had specifically informed Hamilton that the HHCA would pay the tip, rather than requesting the tip be paid by members;

   d. That – after approval from Henley and/or Hamilton – the HHCA described the experience to their members, like the Winchesters, as the "Bigfoot Safari Discovery Tour" which would include a drive through Bigfoot farms, a "working Scottish Highland Cattle Farm."

55. Discovery also confirmed that because he was an HHCA member, Henley had received the HHCA invitation to the annual meeting that described the experience, and therefore Henley – and Bigfoot through Henley – knew how HHCA had described the tour to its members and that the price charged to members was $10.00 per person.

56. Before and after the production of those records by the HHCA, Bigfoot, Henley and Hamilton offered false testimony under oath in an effort to establish support for Bigfoot's claims, including the following discovery responses and testimony:

a. That Randy Winchester and Emily Winchester did not take the tour;

   b. That Randy and Emily Winchester did not pay $10.00 each to take the tour;

   c. That the purchase price for the tour was not $10.00;

   d. That Bigfoot through its representative did not call Emily Winchester on her cell phone repeatedly;

   e. That Bigfoot through its representative did not call Randy Winchester at 8:30 p.m. on a Saturday

57. The statements and testimony described in the preceding paragraph was false.

58. During discovery, Fisher permitted and, on information and belief, encouraged Bigfoot, Henley and Hamilton to make sworn statements and offer testimony he knew or exercising reasonable care should have known was false, including that testimony and statements referenced herein.

59. During discovery, Mr. Fisher continued to pursue inquire regarding Dancing Cow Farms despite that portion of the lawsuit being dismissed.

60. Prior to commencing the lawsuit, Fisher knew or should have known that the statements and testimony identified in the preceding paragraphs were false and/or were not defamatory as a matter of law.

61. Prior to commencing the lawsuit, Mr. Fisher failed to property investigate his client's claims and failed to conduct a reasonable inquiry into those claims, including the factual and legal merit thereof.

62. During all times relevant hereto, Fisher was a partner in Defendant Neale & Newman, L.L.P., and as such, was acting as its agent in the course and scope of his partnership, and accordingly, Defendant Neale & Newman, LLP is vicariously liable for his conduct.

63. Randy and Emily Winchester filed for summary judgment in the underlying litigation, asserting that Bigfoot had failed to establish evidence supporting the claims asserted.

64. On August 30, 2019, Federal District Court judge Beth Phillips held that, as a matter of law, the uncontroverted facts established in discovery confirmed (1) that the statements at issue were true; and (2) that the statements at issue were not defamatory as a matter of law; and granted summary judgment on Bigfoot's claims against Randy and Emily Winchester.

*Defendants' Use of Lawsuits, including the Underlying Litigation, for purposes of Coercion*

65. Fisher and Neale and Newman have a long standing relationship with Henley, Hamilton, and have represented various business entities owned by Henley and Hamilton.

66. On at least two prior occasions, Fisher filed lawsuits on behalf of entities owned by Henley and/or Hamilton asserting that the defendants against whom the claims were made were responsible for making false and defamatory statements.

67. On information and belief, those lawsuits were not meritorious, factually or legally, but instead were brought for the purpose of coercing the defendants named therein to either remove unfavorable statements related to businesses owned by Henley and/or Hamilton, to punish those defendants for making the statements, and to discourage others from exercising their first amendment rights with respect to their experiences with and opinions regarding Defendants' businesses.

68. On information and belief, Fisher and/or other Neale & Newman attorneys made demands on third-parties against whom suit was never ultimately file wherein the attorneys demanded those parties remove unfavorable statements related to businesses owned by Henley and/or Hamilton, threatening to file lawsuits against those parties if those unfavorable statements were not removed, even though the attorneys knew that any such legal action was not cognizable based on the law and the facts at issue.

69. Defendants' purpose in filing the underlying litigation against Randy and Emily Winchester and Dancing Cow Farms, as well as the purpose in making the demands and filing the lawsuits described in the preceding paragraphs, was not to secure proper adjudication of a disputed claim; but rather were asserted for the purpose of punishing the Winchesters and others for exercising their First Amendment rights and to procure removal of statements the Defendants Hamilton and Henley viewed as

harmful to their businesses, to coerce the Winchesters and others to remove lawfully published statements related to the Defendants and their businesses, and to discourage any future critics from making similar statements.

70. Defendants continued the prosecution of the underlying litigation to compel the Winchesters to expend funds and experience financial detriment, even though the Defendants knew that the continued prosecution of the claims would not result in a judgment for the Defendants.

71. Defendant Bryan Fisher knew or should have known that the suit, on institution, was based on facts that were untrue, or, at minimum, discovered that the facts asserted were untrue during the litigation but failed to dismiss the suit or withdraw from representation.

72. Defendants knew or should have known that there was no evidence that Randy Winchester's review caused Bigfoot any loss of the nature sufficient to support a claim for defamation under Missouri law.

### *Harm to the Winchesters*

73. As a result of the Defendants malicious prosecution of the underlying litigation, Randy and Emily Winchester sustained damages including but not limited to: the costs and expenses of defending the litigation, including but not limited to attorney fees, travel expenses, mediation fees, deposition expenses and other costs of litigation; lost wages for time required to miss work to participate in their defense, as well as in depositions and mediations; as well as significant emotional distress associated with being named as a defendant in a lawsuit.

### **COUNT I – MALICIOUS PROSECUTION**

74. Plaintiffs incorporate by reference the allegations stated in paragraphs 1 through 68, as if fully incorporated herein by reference.

75. Defendants commended and initiated the underlying litigation, and continued to prosecute the case through its conclusion, wherein the Court granted Defendants' summary judgment, terminating the case.

76. As articulated in detail above, when initiating and continuing the litigation, Defendants acted without probable cause, and with malice (including legal malice and malice-in-law).

77. Defendants did not have a reasonable belief in the facts alleged; in fact, the Defendants knew that the facts alleged were false.

78. Defendant Fisher did not have a reasonable belief that the claim was valid.

79. The underlying action terminated in favor of Randy and Emily Winchester.

80. Randy and Emily Winchester sustained damages as a result of the Defendants conduct.

81. In engaging in the conduct described herein, when the Defendants filed and subsequently failed to dismiss the underlying lawsuit, Defendants were motivated by the improper intent to suppress the Plaintiff's exercise of free speech and because, when Randy Winchester declined to comply with the extortive efforts to coerce him to remove the review at issue, Defendants filed the underlying litigation against Randy Winchester and his daughter because Defendants wanted to punish Randy Winchester, cause him to incur attorney fees, further coerce him to remove the unfavorable review in exchange for dismissal of the meritless suit, and otherwise punish Randy Winchester for failing to submit to Defendants' pre-suit demands.

82. Accordingly, Plaintiffs are entitled to an award of punitive damages against each Defendant.

83. Plaintiffs request a jury trial on all claims asserted herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, in an amount that is fair and reasonable to be determined at trial, but no less than $75,000, for punitive damages, and for attorneys' fees and costs incurred and expended, and for such other relief as the Court deems just and proper in this matter.

Respectfully submitted,

HINKLE LAW FIRM LLC
8711 Penrose Lane, Suite 400
Lenexa, Kansas 66219-8197
913-345-9205/ FAX: 913-345-4832


By: */s/ Michelle R. Stewart*
    Michelle R. Stewart, mstewart@hinklaw.com  #51737
    Suzanne R. Bruss, sbruss@hinklaw.com     #60319

    And

JRJ LAW FIRM, LLC
1201 Northwest Briarcliff Parkway
2nd Floor Briarcliff West
Kansas City, MO 64116
Phone: 816-274-2157
Web: www.jrjlawkc.com



By:    */s/ Jennifer R. Johnson*
    Jennifer R. Johnson, jennifer@jrjlawkc.com    #59197

ATTORNEYS FOR PLAINTIFFS

## REQUEST FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs Randy Winchester and Emily Winchseter hereby demand a trial by jury in the above-captioned action of all issues triable by jury.

        HINKLE LAW FIRM LLC
        8711 Penrose Lane, Suite 400
        Lenexa, Kansas 66219-8197
        913-345-9205/ FAX: 913-345-4832


By: */s/ Michelle R. Stewart*
        Michelle R. Stewart, mstewart@hinklaw.com  #51737
        Suzanne R. Bruss, sbruss@hinklaw.com      #60319

        And

        JRJ LAW FIRM, LLC
        1201 Northwest Briarcliff Parkway
        2nd Floor Briarcliff West
        Kansas City, MO 64116
        Phone: 816-274-2157
        Web: www.jrjlawkc.com


By:    */s/ Jennifer R. Johnson*
        Jennifer R. Johnson, jennifer@jrjlawkc.com   #59197

ATTORNEYS FOR PLAINTIFFS